Filed 8/22/16  In re B.M. CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re B.M. et al., Persons Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> H.A., <br><br> Defendant and Appellant. | A146594 <br><br> (Alameda County Super. Ct. Nos. OJ13020846, OJ13021112) |

Appellant H.A. (Father) argues the juvenile court erred in failing to apply the beneficial parental relationship exception to termination of parental rights in the dependency cases of his four and five-year-old daughters.  (See Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i).)[1]  We conclude the court did not abuse its discretion in finding this is not an extraordinary case that justifies depriving dependent children of the permanency of adoption.

## I.  BACKGROUND

Father and A.M. (Mother; together, Parents)[2] left their two daughters (B.M., born 2009, and M.M., born 2011; together, Children) in the care of their maternal grandmother

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] Mother is not a party to this appeal.

for an extended period of time, even though the grandmother had a history of methamphetamine abuse, untreated mental health problems, child welfare referrals, and a conviction for willful cruelty toward a child. In April 2013, the older child was molested by one of her grandmother's roommates. Parents learned of the abuse and did not take any protective action. Other roommates of the grandmother reported the abuse, and the Sonoma County Human Services Department placed the girl in emergency foster care and filed a juvenile dependency petition on her behalf. The Sonoma County Superior Court sustained the petition under section 300, subdivisions (b) (failure to protect) and (d) (sexual abuse), issued a restraining order against the grandmother and others, and transferred the case to Alameda County where Parents resided.

After the older child's removal, it was believed that her younger sister was staying with Parents or paternal relatives in Oakland. In June 2013, the Alameda County Social Services Agency (Agency) received a phone call from R.S., the mother of one of Father's friends, who reported that she had been caring for the younger child "on and off for some time" and had not heard from Parents except for texts requesting pictures of their daughter. R.S. opined that Parents (who were 19 and 20 years old) were not ready to be parents. The Agency filed a petition on behalf of the younger child pursuant to section 300, subdivisions (b) (failure to protect), (g) (no provision for support), and (j) (abuse of sibling). The child was detained, and both girls were placed in R.S.'s care.

By August 2013, the court had removed the Children from Parents' care, and granted reunification services. Up to this time, Parents had made little effort to obtain services and reunify with their daughters: they were homeless and unemployed, had dropped out of high school, did not follow through on service referrals, often missed scheduled visitation, and failed to maintain regular contact with the Agency. Beginning in September, however, both Parents began to participate in Family Drug Court to treat abuse of marijuana and methamphetamine, as well as cocaine/crack in Father's case. Mother also participated in weekly family therapy and regularly visited the Children and met with the Agency social worker, but failed to follow through with a mental health assessment or treatment. Father participated inconsistently in drug treatment, obtained

2

some temporary employment, and visited the Children regularly, but failed to follow through with a mental health assessment.

In January 2014, Mother entered residential drug treatment and gave birth to Parents' third child.[3]  In February, the court continued the Children's removal and reunification services.  Thereafter, Mother continued to participate in drug treatment, family therapy, and regular visitation.  Father stopped participating in drug treatment by March, but continued to participate in family therapy and regular visitation.  The court again continued removal and reunification services in the Children's cases.

By the end of 2014, Mother had left her residential treatment program and had been arrested for possession of methamphetamine; Father had not followed through with outpatient substance abuse treatment or testing and consistently declined mental health assessment or treatment; the juvenile court had terminated services in the older child's case and the Agency was recommending termination of services in the younger child's case; and Parents' relationship had deteriorated with conflict over custody of the baby.  In March 2015, Father's new girlfriend reported a violent incident that Father attributed to retaliation from a rival gang.  Later that month, Father was arrested for driving under the influence:  "[A] witness identified [Father] as the driver in a hit and run accident, and he smelled strongly of alcohol and performed poorly on field sobriety tests."[4]  At an August 24, 2015 hearing, Father's counsel informed the court that Father had been arrested for failure to appear at a hearing on his March 2015 driving under the influence case and was in custody.

---

[3] This child is not subject to this appeal and is referred to as "the baby."

[4] Also in March 2015, Mother obtained a family court order granting her full custody of the baby and required police assistance to retrieve her from Father's home. However, the following May, the Agency detained the baby and filed a petition on her behalf pursuant to section 300, subdivisions (b) and (j) after Mother failed to obtain medical care for her.  Father was the first to seek medical attention for the baby, and the Agency ultimately released her to Father noting, "It was obvious [Father] and [the baby] have a strong and loving bond."

*The Section 366.26 Hearing*

The section 366.26 hearing was conducted over several days between April and October 2015. In addition to witness testimony, evidence before the court included the Agency's written reports and a court-ordered bonding study.

The Agency's reports indicated that Parents attended weekly or twice-weekly visits with the older child in April and May 2013, and weekly visits with both girls in late June and early July. They did not visit between mid-July and late September. From late September 2013 to the end of 2014, Parents participated in weekly therapeutic visitation. "Overall [these] visits went well, but there were some concerns at times about how [Father] expressed anger and frustration during visits, both with the girls, and especially with [Mother]. Of additional concern were [Parents] arguing in front of the children during visits." On December 9, 2014, the court ordered separate visits, with Mother and Father attending on alternate weeks, and he improved at handling his frustration during visits when Mother was not present. Father visited consistently in 2015.

As to the nature of parent-child relationships, the Agency's reports described the Children as consistently glad to see Parents for visitation and, initially, as having been distressed to separate from them at the end of visits. Parents were described as affectionate, playful, and generally appropriate with discipline during those visits; however, arguments or disrespectful communications between Parents necessitated separate visits. Father sometimes teased the Children antagonistically or became physically forceful when he felt overwhelmed or frustrated, but he improved over time. From the onset of visits, the older girl did not consistently seek out help or comfort from Parents, and after a few months the younger girl became increasingly inconsistent in seeking out help or comfort from them. As visitation progressed, the Children showed distress and regressive behavior at their preschool in anticipation of visits or when visits were cancelled. The social worker opined, "While . . . [the Children] clearly enjoy visits with their parents, they only see [them] during visits—which are designed to be pleasant. [¶] . . . [the girls] look to their caregiver for the day to day support, love, and structure that all young children need."

4

The bonding study was prepared by a psychologist and was based on his review of the juvenile court record, interviews with Parents and R.S., and observations of visits between the Children and each of the three adults. With regard to Father, the psychologist observed that the Children called him "daddy" and were friendly and playful with him. They asked for his help and at times sought comfort from him. At times the girls were "animated, talked freely with [Father], and appeared very comfortable in their interactions with him"; at other times, they did not want to sit close to him or there was little interaction or physical affection. They sometimes separated easily from him, and sometimes showed separation distress. Father disciplined them appropriately, but missed some of the older child's emotional cues.[5]

R.S.'s visit with the Children was "characterized by warmth, affection, and mutuality." R.S. "reflected on the girls' behavior, intentions and emotions in her comments. She was very emotionally attuned to them. [¶] . . . [¶] . . . She paced her actions with the children at a level consistent with their play tempo. She stimulated them intellectually, especially in terms of symbolic/fantasy development. She set appropriate structure and limits and was successful in gaining their compliance." An especially high level of positive affect and mutual engagement occurred between the younger girl and R.S. The younger girl told the psychologist she was more likely to seek help and comfort from R.S. than from Parents, and she called R.S. "my other mommy."

The psychologist concluded that the older girl "appears to have developed an attachment to both of her parents. She is comfortable interacting with them, and seeks their help, guidance and comforting when needed. Most often she accepts their efforts to help or comfort her. . . . [¶] [She] also appears to be attached to [R.S.] A high level of warmth, support seeking, and comfort seeking was noted. . . . [¶] Although displaying an

---

[5] The psychologist described Mother's visits with the Children as warm and comfortable and they called her "mommy." Mother at times was subdued and passive, but at other times showed more enthusiasm. She generally responded appropriately to the Children's behavior, but made some inappropriate comments to the older child and missed some of her emotional cues. The Children showed no distress when Mother left the room.

attachment to each of these adults, there is some question as to the extent of security she experiences from these relationships. She presented as ambivalent in her attachment style with each of the adults. . . . It is likely that she is being affected by the legal and residential limbo in which she finds herself, as well as the adversity she experienced prior to placement. [She] believes she will return to the care of [Parents] but the uncertainty of her situation makes her anxious. Once a decision is made and permanency is achieved, it is likely that her anxiety will lessen and her sense of security will strengthen. [¶] . . . [¶] . . . If she remains with [R.S.] and if that placement is supported by her parents, she is likely to develop a greater degree of emotional security over time. . . . [¶] . . . [¶] [R]emoving [her] from the care of [R.S.] only places the child at additional risk of undermining her chances for developing a more secure internal sense of herself and the world."

The psychologist concluded that the younger girl "also appears to have developed an attachment to both of her parents, as well as to [R.S.] She is comfortable with [Parents], enjoys being with them, seeks their help and comforting when needed, and generally responds well to their efforts. . . . Her primary attachment, however, appears to be with [R.S.], which is understandable given her age when placed in care and the amount of time she has lived with [R.S.] She identifies [R.S.] as the preferred person with whom to share activities, to help and take care of her, and to comfort her when she is hurt or upset. In short, her internal sense of security, safety, and nurturance is tied more to the care she has received in her current placement than with the care she received prior to placement or with the ongoing visits she has had with her mother and father. [¶] . . . [¶] . . . At this point, . . . [her] relationships with [Parents] are primarily play-based. [She] has not had sufficiently consistent or high quality time with [them] to have developed a truly secure relationship with either of them." Moreover, "[j]ust because a child is securely attached to one person . . . does not mean that she will develop a comparable level of security with a new caregiver. In short, if [she] is reunified with either or both of her parents, it should <u>not</u> be assumed that she will necessarily develop a secure attachment with them just because she currently experiences security with [R.S.]"

Assuming the Children remained with R.S., the psychologist opined that continuing contact with Parents "can have considerable benefits for children as they grow up, especially in terms of identity development and coping with adoption-related loss. However, such contact is only beneficial when birth parents and adoptive parents or guardians are able to respect one another and develop a cooperative relationship that fosters security and a sense of well-being on the part of the children." R.S. had previously adopted seven children: three were adults living outside her home and two eight-year-olds and two five-year-olds were in the home with the Children. She had an open adoption arrangement with all of the adoptees, allowing contact with birth relatives who followed certain guidelines. She wanted a similar relationship with Parents and had no reservations about Mother, but reported conflict with Father. The psychologist commented, "In this case, the relationship between [R.S. and Mother] is quite good. . . . On the other hand, the relationship between [R.S. and Father] is quite acrimonious. Neither trusts the other, and [R.S.] has even gone so far as to state that she doubts she could be the children's guardian because of the threats made by the father to challenge a guardianship arrangement."[6]

The psychologist's testimony was consistent with his report. He reiterated that continued contact with Parents would only be beneficial for the Children if Parents supported permanent placement with R.S., and if Parents were free of drug and mental health issues. He testified that the permanency of either adoption or an *unchallenged* guardianship would lessen the older child's anxiety, and noted that development of a

---

[6] Father testified that his relationship with R.S. was "okay," and he believed he could work with her on arrangements for visitation. He denied sharing harsh words with her in person or by text, but said he once spoke harshly to her by phone. Mother testified that "[m]e and [R.S.] aren't talking at the moment because of this whole situation with [Father] and her . . . . I just want to step back and let things happen. [¶] . . . [¶] . . . I just don't want to be in the middle of their dispute . . . ." Mother also testified she was now afraid R.S. would not let her see the children if they were adopted, and she preferred legal guardianship so she might be able to reunite with the Children eventually. Mother acknowledged to the psychologist, however, that the Children "have a stable and loving home with [R.S.] and are emotionally close to her."

7

secure attachment "is absolutely critical at all ages." Addressing R.S.'s "Anglo-Saxon" heritage and the Children's Latino heritage, the psychologist testified, "Research shows that children placed trans-racially generally do well in terms of general adjustment. Potentially there is an implication in terms of racial or ethnic identity and pride. Although . . . if a white parent . . . goes out of their way to learn about that background, to support that background, to give the child the experience with people of that background including birth family, then children do well in terms of developing an appropriate racial pride and identity and an ethnic pride and identity as well. [¶] . . . [R.S. is] comfortable with that. She's certainly indicated a desire and willingness to do this." Some of her adopted children were biracial, and she had kept the birth parents involved in their lives.

At oral argument on the section 366.26 matters,[7] all parties stipulated that the Children were adoptable. Mother submitted on the evidence, and Father urged the court to apply the beneficial parental relationship exception to termination of parental rights. The Agency argued the Children's relationship with Father was not a parental relationship that outweighed the benefits of permanency: both girls were young (four and five); they had spent a minimal portion of their lives with Father, having lived with R.S. for more than two years and having been in the Parents' care only intermittently before removal; Father's relationship with them was play-based rather than parental or a primary psychological attachment; R.S.'s relationship with them was a primary psychological attachment; neither child longed to be in Parents' care; and the Children needed

_____

[7] On August 10, 2015, while the section 366.26 proceeding was still underway, Father filed section 388 modification petitions seeking each child's return to his care with family maintenance services because he had "demonstrated substantial life style changes to the extent that a sibling, [the baby], has been placed with [him] . . . at the request of [the Agency] and with Court approval . . . and [he was] demonstrating sobriety by drug testing." At a September 1 hearing, the court ruled that Father failed to state a prima facie case for modification because "there's simply not enough information here. These are complex issues. I would have expected some more information . . . [regarding] Father's performance under the Case Plan . . . , whether or how he's mitigated the reasons that brought [the Children] out of home care, why the return of the [Children] at this juncture would serve [their] best interests." Although Father appealed from the denial of this petition, he raises no argument regarding it in his appellate briefs.

8

permanency and maintenance of their relationship with R.S., which was the most important relationship they had at that point. The Agency also noted that Father had not completed services under his case plan that would address his underlying substance abuse problems, which was relevant to the impact of continuing contact with Parents. Minors' counsel made similar arguments.

Father argued the best disposition for the Children was guardianship, "at least for the time being with [R.S.]," with continuing contact with Parents. Father had made substantial changes in his life and obtained custody of the baby. He had been "extremely consistent with the exception of a brief period of time recently" with visitation. As the bonding study demonstrated, Father was a "man who presents as an involved and loving, caring parent who stimulates the girls intellectually and the children displayed an emotional attachment to [him]." He urged the court not to "sever this relationship between the father and his daughters permanently and forever versus keeping these children in what we're told is a functional, comfortable and secure home where the guardian will continue—presumably she loves these children—will continue to meet their needs . . . [and] maintain a relationship with the man that they call daddy."

The juvenile court ruled that the beneficial parental relationship exception to termination of parental rights did not apply. "I want the record to be clear that the willingness of [R.S.] to allow for continued contact with [Parents] is not a consideration that is properly before the Court. It has not been considered as a factor in these proceedings even though that information was constantly put before the Court. Also, I want the record to be clear that I do understand that a parent need not show that the children have a primary attachment to a particular parent. [¶] . . . Instead I look to the quality of the relationship in evaluating whether the attachment is substantial, positive and emotional." The court found that Parents had maintained regular visitation. The older child had been out of her Parents' care for half of her life and the younger child for more than half of her life. The Children had "largely positive interaction" with Parents, but the older child "needs permanence. She's experienced early neglect and trauma and . . . [i]t is important that this matter be resolved." The court ruled, "I cannot say that the

9

strength and quality of the parent-child relationships in this case outweigh the security and sense of belonging that a new family would offer these children given their unique histories," and it terminated Parents' parental rights.

## II.    DISCUSSION

Father argues the juvenile court erred in declining to apply the beneficial parental relationship exception to termination of his parental rights. The Agency defends the court's ruling. We affirm.

"By the time of a section 366.26 hearing, the parent's interest in reunification is no longer an issue and the child's interest in a stable and permanent placement is paramount. [Citations.] . . . The child has a compelling right 'to [have] a placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child.' " (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1348.) "[I]t is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*Id.* at p. 1350.)

At a section 366.26 hearing, the juvenile court must first determine by clear and convincing evidence whether it is likely the dependent minor will be adopted. (§ 366.26, subd. (c)(1).) If the court finds a likelihood of adoption, the court *must* terminate parental rights and order the child placed for adoption unless, as applicable here, it finds a "compelling reason" that termination would be detrimental under one of the exceptions listed in section 366.26 subdivision (c)(1)(B). A party arguing that one of those exceptions applies has the burden of producing evidence that establishes the exception. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1343 [discussing former § 366.26, subd. (c)(1)(A), predecessor of § 366.26, subd. (c)(1)(B)].) Under the beneficial parental relationship exception, the court must find a "compelling reason" that termination would be detrimental because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) "We apply the substantial evidence standard of review to the factual issue of the existence of a beneficial parental relationship, and the abuse of discretion standard to the determination of whether there is a compelling reason for finding that

10

termination would be detrimental to the child." (*In re Anthony B.* (2015) 239 Cal.App.4th 389, 395.)

"The existence of interaction between the natural parent and child will always confer some incidental benefit to the child." (*In re Lorenzo C., supra,* 54 Cal.App.4th at p. 1342.) The beneficial parental relationship exception requires more, "that the parent-child relationship promote the well-being of the child to such a degree that it outweighs the well-being the child would gain in a permanent home with new, adoptive parents." (*Ibid.*) "[T]he court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) "The factors to be considered when looking for whether a relationship is important and beneficial are: (1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the positive or negative effect of interaction between the parent and the child, and (4) the child's particular needs." (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1315.)

Courts have cautioned that it is not "reasonable to require the parent of a child removed from parental custody to prove the child has a 'primary attachment' to the parent, or to show the parent and the child have maintained day-to-day contact. If that were the standard, the rule would swallow the exception." (*In re S.B.* (2008) 164 Cal.App.4th 289, 299; *In re Jason J.* (2009) 175 Cal.App.4th 922, 937 [" 'some measure of benefit' " in continued contact is not sufficient alone to invoke beneficial parent relationship exception].) When a child has been placed with a nonparent for a significant amount of time, "we expect the child has developed or will develop a secure parental relationship with his or her primary caregiver or prospective primary caregiver." (*S.B.*, at pp. 299–300.) The existence of that relationship does not necessarily negate the harm the child would experience from the loss of a significant parental relationship, which "may be continued or developed by consistent and regular visitation after the child

11

has been removed from parental custody." (*Id.* at p. 299, italics omitted.) Further, termination of parental rights is not justified by an expectation that the harm of losing the parental relationship will diminish over time or "on the basis of an unenforceable promise of future visitation by the child's prospective adoptive parents." (*Id.* at p. 300.)

Here, Father stipulated that the Children were adoptable, and the juvenile court reasonably found that he had maintained regular visitation. The main disputed issues were the quality of Father's relationship with the Children and whether maintaining that relationship was a compelling reason to deny the Children the permanence of adoption. The court expressly stated that it was not relying on a finding that the Children lacked a primary attachment to either Mother or Father, and it was not considering R.S.'s apparent willingness to allow continuing contact between the girls and Parents. Although not expressly noted, the court also could not assume that R.S. would agree to serve as the Children's guardian in the event adoption was rejected as the permanent plan, given that R.S. had expressed reluctance to do so given her difficult relationship with Father.

Applying the four factors enumerated in *In re Bailey J., supra,* 189 Cal.App.4th at page 1315, the court noted the Children's ages (four and almost six), the percentage of their lives lived outside parental care (at least half of their lives), the nature of the parent-child relationship (a "largely positive interaction"), and the needs of the Children. Focusing on the older child, the court found she "experienced early neglect and trauma and . . . [i]t is important that this matter be resolved," giving her permanence. The court concluded that this need for permanence outweighed the benefits of continuing the parental relationship—explicitly for the older child and impliedly for her younger sister.

The juvenile court's factual findings are supported by substantial evidence. The Children's ages are undisputed of course, and the court if anything overestimated the amount of time they had spent in parental custody, given evidence that Parents had frequently left them in others' care. The record supports the court's description of the Children's relationship with Father as "largely positive," but the record also supports its implied finding that the relationship with Father was not such that the Children would be exposed to great harm if it were severed due to adoption. The older child had not

12

developed a secure attachment with Father. From the onset of visitation shortly after her removal, she did not consistently seek out help or comfort from Father. She reacted negatively to Father's teasing and physicality, and while Father modified this behavior over time she still showed ambivalence toward him at the time of the psychologist's observation. The psychologist testified that development of a secure attachment is critical for all children's well being and that the older child still lacked a secure attachment due to her traumatic experiences and lack of resolution in her living situation. He opined that the younger child had a secure attachment to R.S., thus supporting the inference that she might suffer significant harm if that attachment was severed because adoption was rejected as a permanent plan.

The juvenile court's ultimate ruling—that the Children's possible loss of their relationship with Father was not a compelling reason to reject adoption as a permanent plan—was not an abuse of discretion. In addition to the foregoing evidence, the court's ruling was supported by evidence that Father had not overcome the problems that had caused the dependencies in the first place: Father never completed substance abuse treatment or obtained a mental health assessment; and, in 2015 (the same year as the court's ruling), he had been arrested twice—including for driving under the influence— and his girlfriend was apparently a target of rival gang violence. This evidence supported an inference that a continuing relationship with Father would involve some degree of instability and insecurity that would ill-serve the Children.

Father unquestionably made progress in overcoming problems that led to the dependencies, as evidenced by his continuing custody of the baby, his regular participation in visitation, and his loving and playful relationship with the Children. But the Legislature has recognized that, "in order to prevent children from spending their lives in the uncertainty of foster care, there must be a limitation on the length of time a child has to wait for a parent to become adequate." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 308.) Father was given a reasonable period of time to reunify. He was, unfortunately, unsuccessful and the Children's interest in permanency and stability took priority. (*Id.* at p. 309.)

13

The question before the juvenile court at the time of the section 366.26 hearing was whether the harm to the Children in severing Father's rights was so great as to outweigh their interest in a stable and permanent placement that allowed their caretaker to make a full emotional commitment to them. The court reasonably exercised its discretion in deciding that adoption by R.S., who had cared for the Children for more than two years, best served their well-being.

## III. DISPOSITION

The order terminating Father's parental rights is affirmed.


_____
BRUINIERS, J.


WE CONCUR:


_____
JONES, P. J.


_____
NEEDHAM, J.


14